**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 14-CR-20642-KMM(s)**

**UNITED STATES OF AMERICA**

**v.**

**TIMOTHY JOHN MIERS,**
        **a/k/a "Vinny,"**

                    **Defendant.**
_____/

### UNITED STATES' MOTION *IN LIMINE* TO EXCLUDE, UNDER FED. R. EVID. 412, TESTIMONY REGARDING VICTIM J.C.M.'S PRIOR SEXUAL HISTORY

The United States of America, by and through the undersigned Assistant United States Attorney ("AUSA"), hereby moves, pursuant to Federal Rule of Evidence 412(a), to preclude the Defendant from cross-examining Victim J.C.M. about her prior sexual history, and to preclude the Defendant from presenting witnesses (such as J.C.M.'s ex-lovers or friends) to testify about J.C.M.'s prior sexual behavior or predisposition.

### FACTUAL BACKGROUND

In or around June 2014, Defendant MIERS and J.C.M. began a consensual sexual relationship.  MIERS met J.C.M., forty years old, through J.C.M.'s family, whom she was visiting with in Miami, Florida.   J.C.M. knew that MIERS was employed as a long-haul truck driver and worked along the eastern seaboard.

On or about June 20, 2014, MIERS invited J.C.M. to do a long-haul drive with him.   The trip would take approximately one week.   J.C.M. agreed and she accompanied MIERS from Miami to Boston and back.   The couple had consensual sex on the trip.

Between June and July 2014, J.C.M. accompanied MIERS on several other long-haul trips.

1

Each would last approximately one week, and the two engaged in consensual sex on the trips.   In or around July 2004, however, J.C.M. stated that MIERS informed J.C.M. that he desired more physically violent sexual encounters.   Specifically, he referenced that he was sexually aroused by films depicting sexual assaults or pain, and mentioned "snuff" films.   J.C.M. informed MIERS that she was not sexually aroused by such encounters.   J.C.M. stated that MIERS would try to bite her or slap her during sex, but she would tell him that she did not like that sort of behavior.

In or around late July 2014, J.C.M. stayed with family members in Tampa, Florida for two weeks, in lieu of traveling with MIERS on work-related long-haul trips.   On or about July 30, 2014, MIERS picked J.C.M. up in Tampa, Florida, and J.C.M. again accompanied him on a long-haul trip.   J.C.M. stated that on the long-haul drives in August 2014, MIERS' behavior became different than before.

Specifically, J.C.M. stated that MIERS became temperamental.   He would frequently get enraged and behave erratic – for no apparent reason.   He began drinking beer while driving, despite J.C.M.'s protests.   He began accusing J.C.M. of infidelity, and seemed particularly concerned about a family friend who J.C.M. had spent time with in Tampa, Florida.   MIERS told J.C.M. that he (MIERS) was a man with a sordid past, and that he had beat and killed women before, if they did not listen to him.   He told JCM about his criminal history, which, according to him, including kidnapping, aggravated assault (that is, dragging a woman down the street), and other felony convictions.   MIERS told J.C.M. that he had killed a prior wife, and that she should fear him.   He told J.C.M. that in his "Italian culture," the women are subservient and submissive and listen to the men.

J.C.M. stated that during August 2014, she became afraid of MIERS.   She continued to placate him on the long-haul trips because she feared his controlling and violent nature.

2

Furthermore, at times he would directly threaten to harm her or her family.

According to J.C.M., on or about August 18, 2014, MIERS and J.C.M. left the Boston, MA area in MIERS' truck, bound for Miami, Florida.  During that trip, J.C.M. stated that MIERS became incredibly violent with her, physically and sexually.  Specifically, MIERS struck J.C.M. about her face with closed fists causing injuries, and forced J.C.M. to stay in the sleeper cabin of the truck as they travelled southbound.  J.C.M. felt that she could not escape MIERS' truck without alerting MIERS (due to issues with the doors and windows, and her proximity to MIERS).

In addition, MIERS continued to accuse J.C.M. of infidelity and display violent rages. J.C.M. stated that she continued to deny the accusations of infidelity.  At one point, MIERS got so upset with J.C.M. that he took her to a rural area she believed to be in or near Georgia.  MIERS pulled his truck over and burned J.C.M.'s left arm with a cigarette as he continued to question her about her infidelities.  J.C.M. stated that MIERS would play a game with her – whereby he would ask her a question, and if she did not say what he believed to be the truth, he would hit her.  At some point, J.C.M. just stated that she did cheat on MIERS, just so that he would stop beating her.

MIERS did not stop the beatings, however.  According to J.C.M., MIERS punched her about her face with a closed fist causing injuries.  He told her, "You are going to force me to kill you."  In addition, he called her names such as "cunt," "whore," "pig," and "motherfucker."

At some point during the trip southbound, MIERS tore off a piece of bed sheeting, gagged J.C.M. with it, and wrapped duct tape at least two times around J.C.M.'s head.  MIERS duct taped J.C.M.'s hands behind her back and duct taped J.C.M.'s arms to her body (by wrapping duct tape around J.C.M.'s abdomen and arms).  At this point, J.C.M. stated that she truly believed that MIERS was going to kill her.  MIERS told J.C.M. he intended to buy a shovel to dispose of J.C.M.'s body, and that, "He was not going to jail for it."

3

MIERS then inflicted a prolonged physically violent attack against her.   MIERS began to strangle J.C.M. and then stopped (after she blacked out).   He later told her that he had killed other people, but that he could not kill her.   He told J.C.M. that God had saved her.

MIERS advised J.C.M. that he knew she wanted to leave him, but that he would not allow it.   MIERS advised J.C.M. that she was now his slave, and that she was deserving of punishment for her bad behavior.   He told J.C.M. that he knew where her family lived, and that he would harm them if she ever told anyone about what was happening.

Between Georgia and Florida, MIERS forced J.C.M. to have sex numerous times.   During this time, and while travelling in Florida, MIERS continued to inflict physical punishment on J.C.M., telling her that this is going to be her daily life with him and that she was his slave.   J.C.M. recalled that MIERS took many photographs of her during this time, beaten and abused.   He took nude photographs of her, and photographs of her performing sexual acts on him.   He took videos of her, in which he called her names, spoke of the abuse he was inflicting upon her, and made her cry in pain while performing oral sex on him.

On the morning of August 21, 2014, MIERS stopped his truck in a warehouse district near Medley, Florida.   MIERS again sexually assaulted J.C.M. anally.   He then punched her in the mouth causing her to bleed because, according to J.C.M., MIERS stated that he was sexually aroused when she performed oral sex while in pain.

MIERS then drove to an unknown warehouse in West Palm Beach, Florida with J.C.M. for the purpose of dealing with issues related to his truck.   While en route there, MIERS sexually assaulted J.C.M. anally and orally in the truck.   During the sexual assault, MIERS inflicted a severe bite injury to J.C.M.'s buttocks.   MIERS then drove back to Medley, Florida.

In Medley, MIERS stopped his truck at an auto parts store.   While MIERS was out of the

truck, J.C.M. was able to escape MIERS' truck and locate assistance from people in the area. J.C.M. stated that she knew she had to escape at this time – if she continued to travel with MIERS, she believed that he would kill her.   When J.C.M. jumped out of MIERS' truck, people in the area called the police.   Medley Police arrived on scene and met J.C.M.   Medley Police observed that J.C.M. had a bloody nose, a black eye, bruising around her mouth and face, burn and bite marks on her arms, duct tape residue on her arms, welts on the back of her head, and was having difficulty swallowing.   Photographs were later taken of J.C.M., which documented her physical condition. J.C.M. told Medley Police about her ordeal.   Witnesses there advised police that the truck had fled the area and gave police a description of the truck.

Medley Police spotted a stationary truck nearby that matched the description given by witnesses.   Law enforcement observed a male, later identified as MIERS, in the driver's seat of the truck, apparently speaking on a cellular telephone.   Law enforcement ordered MIERS out of the truck, and ordered him to put down his cellular telephone.   MIERS complied.   Medley Police conducted a protective sweep of MIERS' truck for additional victims or suspects and observed, in plain view, among other things, a roll of duct tape.

Medley Police impounded MIERS' cellular telephone, an Apple iPhone.   Pursuant to a federal search warrant, the iPhone was searched on or about September 25, 2014.   On MIERS' iPhone, law enforcement located a video, recorded by MIERS on August 21, 2014 at approximately 5:56 a.m. (EDT), which showed MIERS forcing J.C.M. to perform oral sex on him. In the video, MIERS instructed J.C.M., who is visibly beaten and bruised, to state that she was a "bitch," "pig," "slut," and other derogatory terms.   MIERS instructed her to call him "master." Further, towards the end of the eighteen-minute long video, MIERS instructed J.C.M. to cry while performing oral sex on him, as it sexually aroused him.   He told her to imagine him having sex

with her daughters in his truck, in order to bring tears to her eyes.

In addition to this video recording, there are numerous photographs of J.C.M. on MIERS' iPhone, taken between August 20 – 21, 2014, in which J.C.M. was visibly beaten and bruised.

## PROCEDURAL BACKGROUND

On October 2, 2014, a Federal Grand Jury in the Southern District of Florida returned an superseding indictment against MIERS charging him with Kidnapping (18 U.S.C. § 1201) and Interstate Domestic Violence (18 U.S.C. § 2261).   Trial is scheduled to commence on October 20, 2014.

## KEY ISSUE IN THIS CASE

In preparation for trial, the parties have discussed possible factual stipulations.   At this time, it is likely that the parties will stipulate that (a) MIERS and J.C.M. traveled in interstate commerce in MIERS' truck between on or about August 11, 2014 and August 21, 2014; and (b) MIERS and J.C.M. were intimate partners and engaged in sexual activity while they traveled in interstate commerce in MIERS' truck.

Therefore, the key issue at trial will be whether, on or about the dates in question, MIERS unlawfully confined, kidnapped, and/or held J.C.M. against her will, for his personal sexual gratification.   The Government anticipates that the Defendant will argue that J.C.M. willingly traveled, and consensually engaged in "rough" sex, with MIERS during this time period.

While consent is a valid defense for MIERS to assert, the Government files this Motion, pursuant to Federal Rule of Evidence 412(a), to preclude MIERS from (1) cross-examining J.C.M. about her prior sexual history – including sexual behavior that MIERS and J.C.M. engaged in prior to August 11, 2014, or (2) presenting witnesses (such as J.C.M.'s ex-lovers or friends) to testify

about J.C.M.'s prior sexual behavior or predisposition.[1]   Such testimony is irrelevant to the core issue in this case – that is, whether J.C.M. consented to the sexual acts that she and MIERS engaged in during a specific time period.   The Defense can easily cross-examine J.C.M. about the type of sex that she and MIERS engaged in on or about these dates – and what her sexual preferences were with MIERS – without delving into her prior sexual history.   Furthermore, the admission of such testimony would only serve to harass and embarrass J.C.M., and, thus, any marginal relevance of it would be outweighed by its prejudicial effects.

### RULE 412(a): THE PROSCRIPTION

Rule 412 of the Federal Rules of Evidence provides that "[t]he following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct: (1) evidence offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition."   Fed. R. Evid. 412(a).   "Sexual behavior" includes "all activities that involve actual physical conduct, *i.e.*, sexual intercourse and sexual contact" or that "imply sexual intercourse or sexual contact," such as the use of contraceptives, the birth of an illegitimate child, or the diagnosis of a venereal disease.   Fed. R. Evid. 412, Advisory Committee Notes, Subdivision (a) (1994).   The reference to "sexual predisposition" is "designed to exclude evidence that . . . the proponent believes may have a sexual connotation for the fact finder," such as "the alleged victim's mode of dress, speech, or lifestyle."   *Id*.   Importantly, "'past sexual behavior' as used in Fed. R. Evid. 412 includes all sexual behavior of the victim of an alleged sexual assault

---

1 Fed. R. Evid. 412(b) provides exceptions in which a victim's prior sexual behavior or predisposition may be admitted in a criminal case.   Fed. R. Evid. 412(c)(A) states that if a party intends to offer evidence under Rule 412(b), the party "must file a motion that specifically describes the evidence and states the purpose for which it is to be offered."   Any such motion must be filed "at least 14 days before trial unless the court, for good cause, sets a different time."   The Defendant has yet to file any such motion.   In an abundance of caution, and in the interest of efficiency at trial, the Government has filed this Motion *in Limine*.

which precedes the date of the trial." *United States v. Torres*, 937 F.2d 1469, 1472 (9th Cir. 1991).[2]

The Advisory Committee said the following about Rule 412's objectives:

> The rule aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the fact-finding process. By affording victims protection in most instances, the rule also encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders.

Fed. R. Evid. 412, Advisory Committee Notes (1994). According to the Advisory Committee, Rule 12 attempts to accomplish these objectives by "barring evidence relating to the alleged victim's sexual behavior or alleged sexual predisposition, whether offered as substantive evidence or for impeachment, except in designated circumstances in which the probative value of the evidence significantly outweighs possible harm to the victim." *Id*.

## RULE 412(b): THE EXCEPTIONS

There are only three exceptions to the prohibitions listed in Rule 412(a):

The court may admit the following evidence in a criminal case:
> (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury or other physical evidence;
> (B) evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecution; and
> (C) evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412(b).

Notably, the defendant's interest in impeaching the credibility of a victim does *not* qualify

---

[2] The Ninth Circuit based this holding on Rule 412's definition of "past sexual behavior" as "sexual behavior other than the sexual behavior with respect to which . . . an offense is alleged." Fed. R. Evid. 412(d). Thus, as Wright and Graham explain: "Rule 412(d) defines 'past sexual behavior' to include all sexual conduct other than the rape or assault that is in issue. Hence the rule embraces all sexual conduct of the victim." C. Wright and K. Graham, Federal Practice and Procedure: Evidence § 5384, at 541 (1980) (footnotes omitted).

as an exception to Rule 412's proscriptions.   *Torres*, 937 F.2d at 1473 (rejecting the defendant's argument that evidence of a sexual incident involving the victim that took place six months after the sexual assault was admissible because it was relevant to the question of the victim's credibility); *see also United States v. Withorn*, 204 F.3d 790, 795 (8th Cir. 2000); *United States v. Richards*, 118 F.3d 662 (8th Cir. 1997).

The first exception set forth in Rule 412(b) is obviously inapplicable here: The Government is relying on neither semen, nor injury, nor physical evidence to prove its case against the Defendant.   Rather, the Government is relying on witness testimony.   Further, the Defendant concedes that he was with Victim J.C.M. between August 11, 2014 and August 20, 2014, and that they engaged in sexual activity.   He does not deny that he was present with J.C.M. when she was beaten and bruised.   He maintains, though, that J.C.M. willingly participated in the sexual acts that they engaged in, and that her physical condition was the result of consensual "rough sex" that they both enjoyed.

With respect to the second exception, the Government concedes that the Defendant and J.C.M. engaged in a consensual sexual relationship, beginning in or around June 2014 and lasting through in or around early August 2014.   The Defendant may, pursuant to the procedures outlined in Rule 412(c), seek to admit evidence of ***specific instances*** of sexual behavior by J.C.M. – involving himself – prior to August 11, 2014.   As of the date of this filing, the Defendant has yet to provide the Government or J.C.M. of any notification that he intends to do that.   The Government would oppose any such motion filed.

Last, as explained further below, with respect to the last exception, the Defendant's Sixth Amendment right to cross-examine Victim J.C.M. is not impeded by limiting his inquiry to preclude questions about J.C.M.'s prior sexual behavior or predisposition.   Such an inquiry is

irrelevant to the charged conduct, and merely would be aimed at embarrassing and harassing J.C.M.   Moreover, pursuant to Rule 403, to the extent that J.C.M.'s prior sexual history has any marginal relevance to this case, it would be significantly outweighed by its prejudicial effects.

## THE DEFENDANT'S CONSTITUTIONAL RIGHTS

The Confrontation Clause of the Sixth Amendment ensures a criminal defendant the right to cross-examine witnesses. *Davis v. Alaska*, 415 U.S. 308, 315 (1974).   But district courts "are afforded wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).   Thus, the question where Rule 412 is implicated is "whether a minimum threshold of inquiry [is] afforded a defendant in the cross-examination of an adverse witness." *United States v. Anderson*, 139 F.3d 291, 302 (1ˢᵗ Cir. 1998) (quotation marks omitted).   In other words, "if the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witness, the constitutional minimum threshold is met," *id*. (citations and quotation marks omitted), and a court need not permit the defendant to inquire into the victim's "past sexual behavior."

The evidence the defendant seeks to admit here – that, prior to August 11, 2014, J.C.M. liked to engage in "rough sex," including slapping, beating, choking, strangulation, and degrading talk, during sex – is precisely the kind of evidence Rule 412 was intended to proscribe.   The evidence is both "offered to prove that a victim engaged in other sexual behavior," and that the victim has a particular "sexual predisposition." Fed. R. Evid. 412(a).   For this reason, every

10

federal circuit court of appeal to have addressed this question has upheld the exclusion of a defendant's forays into a victim's past sexual experiences, where, as here, that evidence was either irrelevant or more prejudicial than probative. *See e.g., United States v. Sarras*, 575 F.3d at 1212-1213 (11th Cir. 2009); *United States v. Culver*, 598 F.3d 740, 749-50 (11th Cir. 2010); *Medina v. United Christian Evangelistic Association*, 2009 WL 3618345, No. 08-CV-22111-MGC (S.D. Fla. 2009); *United States v. Griffith*, 284 F.3d 338 (2d Cir. 2002); *United States v. Ramone*, 218 F.3d 1229 (10th Cir. 2000); *United States v. Byrne*, 171 F.3d 1231 (10th Cir. 1999); *Anderson*, 139 F.3d 291; *United States v. Torres*, 937 F.2d 1469 (9th Cir. 1991); *United States v. Bittner*, 728 F.2d 1038, 1042 (8th Cir. 1984).

In *Sarras*, for example, the defendant was charged with photographing himself engaged in various stages of sexual and oral intercourse with his minor step-daughter. *Sarras*, 575 F.3d at 1212. The only issues at trial were, first, the identity of the adult male in the photos, and, second, whether the defendant knew that those photos were stored in his computer. *Id*. Sarras moved the Court to "permit [him] to ask [the victim] questions about a post-abuse sexual relationship with her boyfriend." *Id*. Sarras claimed that the victim had opened the door to this testimony by testifying that she had been traumatized by her sexual abuse at the hands of the defendant. *Id*. He "claim[ed] broadly that the district court's limitation left the jury with the false impression that [the victim] was traumatized by the sexual activity and had not been photographed nude, although [the victim] admitted to police that she engaged in explicit sexual activity with her boyfriend." *Id*. at 1212-1213.

The district court refused to allow defense counsel to cross-examine the minor about her other sexual relationships, and the Eleventh Circuit affirmed. The Court explained: "While the Constitution unquestionably provides a defendant with the right to be heard, this right is not

unbounded.   The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id.* at 1213 (quoting *United States v. Frazier*, 387 F.3d 1244, 1271 (11th Cir. 2004)).   The Court added that "victims of sexual abuse can be traumatized whether or not they have had other sexual relations." *Id.*   The Court went on to say that the victim's other sexual behavior was simply irrelevant to the issues at trial.   In any event, the Court concluded, "the district court afforded Sarras a constitutionally adequate opportunity to impeach [the victim]" about a whole range of other issues related to her credibility.   *Id.*   Because the defendant had been afforded a constitutionally adequate opportunity to cross-examine the victim on other grounds, the Court found that he had "not met his burden of demonstrating that the district court's application of Rule 412 violated a constitutional guarantee." *Id.*

In *Griffith*, the defendant was charged with transporting a girl across state lines with the intent that she engage in prostitution. At trial, the defense requested an opportunity to cross-examine the victim "regarding her relationships with men in general, her father in particular, her drug use, and her sexual history."   284 F.3d at 352.   The district court "found that any possible responses by [the victim] on these subjects would not have been relevant," *id.*, and the Second Circuit affirmed.   *Id.* ("We agree with the district court that [the victim's] testimony on these subjects would not have been relevant because it would not have tended to make more or less probable any fact at issue in the case.").

In *Ramone*, the defendant was accused of beating his girlfriend and of forcibly sodomizing her with certain inanimate objects.   Much as the Defendant would likely try to do here, at trial, the defendant sought to point out that, on other days and during other sexual encounters, the victim

had consented to the use of inanimate objects.  The district court refused to allow this line of questioning, and the Tenth Circuit affirmed.  The Court disagreed with the defendant that "evidence of prior consensual use of inanimate objects during sex is probative of whether sex after a brutal beating was consensual."  218 F.3d at 1238.  The Court agreed with the district court that "any limited probative value the testimony might have had was outweighed by unfair prejudice, confusion of the issues and the potential for misleading the jury[.]"  *Id*.  The Court concluded by saying that the "testimony likely would have focused the jury's attention on the victim's prior unusual sexual practices rather than on the crucial issue of whether she consented to sexual activity on the night in question."  *Id.*

In *Byrne*, the defendant was charged with "using telecommunications devices in interstate commerce to entice a minor to engage in sexual acts in violation of 18 U.S.C. § 2422(b), and traveling in interstate commerce for the purpose of engaging in sexual acts with a minor in violation of 18 U.S.C. § 2423(b)."  171 F.3d at 1233.  The defense sought to question the minor about his interactions with another older man he had met over the Internet. "The minor had traveled out of town to meet this man, and authorities had arrested him as a runaway."  *Id*.  The district court refused to allow the defense to inquire about the minor's relationship with this other older man, and the Tenth Circuit affirmed.  The Court explained:

> The record reflects that the district court refused to allow questioning only regarding an unrelated encounter the witness had with another man and the witness' corresponding arrest on runaway charges. The district court found such testimony substantially more prejudicial than probative. We agree. We therefore conclude that the cross-examination restrictions imposed by the district court fell within the bounds permitted by the Sixth Amendment.

*Id*. at 1234.

In *Anderson*, the defendants were convicted of transporting juveniles in interstate

commerce with the intent that the juveniles engage in prostitution. 139 F.3d at 291. On appeal, the defendants challenged the district court's decision to preclude "evidence of commercial sexual activity by the juveniles that occurred both before and after the relevant time period." *Id*. at 303. The defendants argued that the "excluded information would have been useful to impeach the juveniles'' credibility." *Id*. The First Circuit disagreed: "We fail to see how evidence of prostitution outside the offense conduct would have any probative value regarding the truthfulness of the two girls. Such a position seems to us to embody a particularly offensive form of stereotyping to which we are loath to give credence." *Id*. The Court added that, "Regardless, both witnesses' credibilities were thoroughly, and quite effectively, tested without the foray into their sexual history." *Id*. Thus, the inquiry into the juveniles' other sexual behavior was unnecessary.

In *Torres*, the defendant had been charged with sexually abusing his girlfriend's 9-year old sister ("the victim"). Six months after the alleged sexual abuse, the victim's sister had found the victim in a bedroom with a 17-year old boy, her panties pulled down to her ankles. At trial, Torres requested permission to cross-examine the victim about this other sexual incident in an effort to show that the 17-year old boy could have been the source of the semen found in the victim's underwear. The court refused to allow this line of cross-examination on the grounds that it was irrelevant, and the Ninth Circuit affirmed. 937 F.2d at 1473 ("A defendant does not enjoy unrestricted latitude in the cross-examination of adverse witnesses. He is limited to issues relevant to the trial, and it is within the broad discretion of the trial court to determine which issues are relevant.").

Finally, in *Bittner*, the defendant was convicted of kidnaping and sexually assaulting a

14

female college student. On appeal, he challenged "the district court's ruling preventing him from cross-examining Brown about a sexual incident with a boyfriend against her will which had occurred three years earlier." *Bittner*, 728 F.2d at 1042. After reviewing the record, the Eighth Circuit affirmed the district court's holding that "evidence of the prior incident was more prejudicial than probative, and in any event, was not relevant to the alleged kidnapping [sic]." *Id.*

Here, questioning the Victim, J.C.M., about her prior sexual history – with other lovers or with the Defendant, prior to August 11, 2014 – is irrelevant because it does not tend to make more or less probable any fact at issue in the case. The jury will have to determine whether the Defendant kidnapped J.C.M. between on or about August 11, 2014 and August 21, 2014, for his personal sexual gratification, and whether he abused her during these dates. Therefore, whether or not J.C.M. engaged in "rough sex" with other lovers or with MIERS prior to August 11, 2014, has no bearing on what occurred between MIERS and J.C.M. during the charged time period.

Further, MIERS can effectively cross-examine J.C.M., affording the jury the ability to appraise her possible biases, credibility, and motivations, without delving into her sexual past. MIERS can inquire about the type of sex J.C.M. preferred, and what she consented to, when she was with him during the charged time period. Further, he can present photographs, text message exchanges, call logs, witness testimony, and other evidence related to his overall relationship with J.C.M. to attempt to show the jury that she consented to accompanying him on long-haul drives.

Last, any limited probative value of J.C.M.'s sexual history is far outweighed by prejudicial effects. As stated in *Ramone*, such "testimony likely would have focused the jury's attention on the victim's prior unusual sexual practices rather than on the crucial issue of whether she consented to sexual activity on the [dates] in question." 218 F.3d at 1238. Permitting the Defendant to question J.C.M. about her sexual history would only serve one purpose: to degrade

and humiliate J.C.M. and shift the jury's attention from the alleged criminal conduct to J.C.M.'s sexual preferences.   That is precisely what Rule 412 was designed to proscribe.   This case is not about J.C.M.'s sexual preferences and history – the admission of any testimony on this topic would simply be a red herring at trial.   Rather, this case it is about MIERS and JCM's sexual relationship between August 11, 2014 and August 20, 2014.   Thus, the scope of cross-examination of J.C.M., with regard to her sexual behavior, should be limited to her relations with MIERS during the time period at issue.

## CONCLUSION

Based on the foregoing, the United States respectfully requests that the Court grant this Motion *in Limine*, and preclude the Defendant from (1) cross-examining J.C.M. about her prior sexual history – including sexual behavior that MIERS and J.C.M. engaged in prior to August 11, 2014, or (2) presenting witnesses (such as J.C.M.'s ex-lovers or friends) to testify about J.C.M.'s prior sexual behavior or predisposition.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:     /s *Vanessa Singh Johannes*
Vanessa Singh Johannes
Assistant United States Attorney
Court ID No. A5501644
99 N. E. 4th Street, 8th Floor
Miami, Florida 33132
TEL (305) 961-9023
FAX (305) 536-4676
Vanessa.S.Johannes@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 8, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and that counsel for the defendant, Assistant Federal Public Defender Anthony Natale, received a true and correct copy of said document via that manner.

 /s *Vanessa Singh Johannes*
Vanessa Singh Johannes
Assistant United States Attorney